## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
|  | * |  |
|  | * |  |
| BARRY MICHAELS, | * |  |
| *Plaintiff*, | * |  |
| v. | * |  |
| MATTHEW G. WHITAKER, IN HIS OFFICIAL CAPACITY, | * | Case No. 18-cv-2906 |
| *Defendant.* | * |  |
|  | * |  |
|  | * |  |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 2

ARGUMENT ...................................................................................................................... 3

I.   The President's Appointment of Matthew Whitaker Violated the Appointments
     Clause............................................................................................................................. 4

     A.   The Appointments Clause Requires That the Senate Confirm an Officer Who
          Exercises the Authority of a Principal Officer And (1) Is Not a Subordinate or (2)
          Was Not Appointed In Response to "Temporary and Special Conditions." ..................... 4

     B.   The President's Appointment of Matthew Whitaker Violated the Appointments
          Clause.......................................................................................................................... 7

          1.   Mr. Whitaker Is Serving as a Principal Officer, Not a Subordinate. ........................... 9

          2.   Even If Mr. Whitaker Is an "Inferior Officer," His Performance of the
               Attorney General's Responsibilities Was Not Necessitated by "Temporary
               and Special Conditions."............................................................................................ 10

     C.   The Original Vacancies Act and Appointments Close to the Time of the Founding
          Confirm That the Appointment of Mr. Whitaker Is Unconstitutional. ............................. 12

II.  The President's Appointment of Mr. Whitaker Was Not Authorized by the Vacancies
     Act................................................................................................................................... 16

     A.   The Vacancies Act Permits the President to Appoint the Acting Attorney General
          Only When the AG Act Does Not "Designate" a Senate-Confirmed Official. ................. 16

     B.   The Court Should Reject the Government's Interpretation of the Vacancies Act............ 20

          1.   Under the plain statutory text, the Vacancies Act does not apply concurrently
               with an office-specific designation statute.................................................................. 20

          2.   Congress enacted the Vacancies Act precisely to reject the argument that it is
               "non-exclusive," while preserving the AG Act and other office-specific
               designation statutes. .................................................................................................. 22

     C.   The Government's Counter-Arguments Lack Merit........................................................ 26

CONCLUSION................................................................................................................... 30

# TABLE OF AUTHORITIES

## Cases

*Edmond v. United States,*
520 U.S. 651 (1997)...........................................................................................*passim*

*English v. Trump,*
279 F. Supp. 3d 307 (D.D.C. 2018) ........................................................................ 30

*Freytag v. Comm'r,*
501 U.S. 868 (1991)................................................................................................ 4

*Hooks v. Kitsap Tenant Support Servs., Inc.,*
816 F.3d 550 (9th Cir. 2016) ................................................................................ 29

*Mississippi ex rel. Hood v. AU Optronics Corp.,*
571 U.S. 161 (2014)............................................................................................... 26

*NLRB v. Noel Canning,*
134 S. Ct. 2550 (2014)........................................................................................... 12

*NLRB v. SW Gen., Inc.,*
137 S. Ct. 929 (2017).......................................................................................*passim*

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
566 U.S. 639 (2012)............................................................................................... 19

*Rehberg v. Paulk,*
566 U.S. 356 (2012)............................................................................................... 26

*United States v. Eaton,*
169 U.S. 331 (1898).........................................................................................*passim*

*United States v. Peters,*
No. 6:17-CR-55-REW-HAI-2, 2018 WL 6313534 (E.D. Ky. Dec. 3, 2018).......................... 29

*United States v. Valencia,*
No. 5:17-CR-882, 2018 WL 6182755 (W.D. Tex. Nov. 27, 2018)........................................ 29

*Whitfield v. United States,*
543 U.S. 209 (2005)............................................................................................... 26

*Whitman v. Am. Trucking Ass'n,*
531 U.S. 457 (2001)............................................................................................... 26

*Zadvydas v. Davis,*
533 U.S. 678 (2001)............................................................................................... 16

## Constitutional Provisions

U.S. Const. art. II, § 2, cl. 2 ..........................................................................*passim*

## Statutes

Act of July 23, 1868, ch. 227, 15 Stat. 168.................................................... 13, 15

Act of May 8, 1792, ch. 37, 1 Stat. 279 .............................................................. 12

Pub. L. No. 100-398, 102 Stat. 985 (1988)...................................................................... 13

Pub. L. No. 89-554, 80 Stat. 378 (1966)........................................................................ 13

5 U.S.C. § 3345 ........................................................................................................... 21

5 U.S.C. § 3345(a) ...................................................................................................... 18

5 U.S.C. § 3345(a)(1) .................................................................................................. 18

5 U.S.C. § 3345(a)(2)-(3) ............................................................................................ 19

5 U.S.C. § 3345(b)(1) .................................................................................................. 20

5 U.S.C. § 3347 ...................................................................................................... 21, 27

5 U.S.C. § 3347 (1966) ............................................................................................... 28

5 U.S.C. § 3347(a) ................................................................................. 17, 19, 21, 22

5 U.S.C. § 3347(a)(1)(B) ............................................................................................. 28

5 U.S.C. § 3347(b) ................................................................................................ 21, 23

5 U.S.C. § 3347c ........................................................................................................ 26

5 U.S.C. § 3348 .......................................................................................................... 21

5 U.S.C. § 3348(b) ............................................................................................... 18, 21

5 U.S.C. § 3348(d) ......................................................................................... 20, 21, 23

5 U.S.C. § 3348(d)(1) .................................................................................................. 21

5 U.S.C. § 3348(e) ...................................................................................................... 21

5 U.S.C. § 3349(a) ...................................................................................................... 21

5 U.S.C. § 3349(e) ...................................................................................................... 27

5 U.S.C. § 3349a ........................................................................................................ 19

5 U.S.C. § 3349b ........................................................................................................ 27

5 U.S.C. §§ 3345-49d ................................................................................................... 1

5 U.S.C. §§ 3346-49 (1966) ........................................................................................ 22

10 U.S.C. § 132(b) ........................................................................................................ 4

10 U.S.C. § 154(d) ........................................................................................................ 4

28 U.S.C. § 508 .................................................................................................... *passim*

28 U.S.C. § 508(a) ................................................................................................. 18, 27

28 U.S.C. § 508(b) ...................................................................................................... 18

31 U.S.C. § 703 ........................................................................................................... 21

38 U.S.C. § 304 ........................................................................................................... 18

40 U.S.C. § 302(b) ...................................................................................................... 18

42 U.S.C. § 902(b)(4) .................................................................................................. 18

50 U.S.C. § 3026(a) ......................................................................................... 4

## Other Authorities

144 Cong. Rec. S11022-23 (Sept. 28, 1998) .............................................. 24

144 Cong. Rec. S11025 (Sept. 28, 1998)................................................... 24

144 Cong. Rec. S12813 (Oct. 21, 1998) .................................................... 24

144 Cong. Rec. S12823 (Oct. 21, 1998)..................................................... 24

144 Cong. Rec. S12824 (Oct. 21, 1998)..................................................... 24

*Authority of the President to Name an Acting Attorney General*,
    31 Op. O.L.C. 208 (2007) ..................................................................... 12

Devlin Barrett, John Wagner & Seung Min Kim, *Trump and Sessions Feud Over the
    Direction of the Justice Department*, Wash. Post (Aug. 23, 2018),
    https://wapo.st/2RHxLWC .................................................................... 2

*Black's Law Dictionary* (10th ed. 2014).................................................... 17

*Designation of Acting Director of the Office of Management and Budget*,
    27 Op. O.L.C. 121 (2003)....................................................................... 12

Exec. Order No. 13,787 (Mar. 31, 2017) ............................................. 3, 19

Alexandra Hutzler, *Donald Trump Will Fire Jeff Sessions After Midterms, Republicans
    Say*, Newsweek (Aug. 24, 2018), http://bit.ly/2rrHQLM ........................ 2

Memorandum for Emmet T. Flood, Counsel to the President, from Steven A. Engel,
    Assistant Attorney General, Office of Legal Counsel, *Re: Designating an Acting
    Attorney General*  (Nov. 14, 2018) .................................................. *passim*

Morton Rosenberg, Cong. Research Serv., *The New Vacancies Act: Congress Acts to
    Protect the Senate's Confirmation Prerogative* (1998)............................ 24

Morton Rosenberg, Cong. Research Serv., *Validity of Designation of Bill Lann Lee as
    Acting Assistant Attorney General for Civil Rights* (Jan. 1998)............... 24

*Oversight of the Implementation of the Vacancies Act: Hearing on S. 1764 Before the
    S. Comm. on Governmental Affairs*, 105th Cong. (1998)................... 23, 24

S. 2176, 105th Cong. (1998).......................................................................... 23

S. Rep. No. 105-250 (1998)........................................................ 23, 24, 27, 29

Statement of Administration Policy – Federal Vacancies Act of 1998 (Sept. 24, 1998),
    https://bit.ly/2rvtI4k ............................................................................... 25

*The Vacancies Act*,
    22 Op. O.L.C. 44 (Mar. 18, 1998) ........................................................ 22

## INTRODUCTION

The President has forced out the Senate-confirmed Attorney General and purported to name a hand-picked, non-confirmed Department of Justice employee as the Acting Attorney General under the Vacancies Reform Act, 5 U.S.C. §§ 3345-49d (Vacancies Act). The appointment not only gave Mr. Whitaker powers that make him a principal officer rather than a subordinate, but it also did not respond to any special condition that necessitated naming a non-confirmed official. Indeed, Congress has designated the Senate-confirmed Deputy Attorney General to serve in that role in the Attorney General Succession Act, 28 U.S.C. § 508 (AG Act).

The President's appointment of Matthew Whitaker was both unconstitutional and contrary to statute. It is also literally unprecedented. This is the first time in American history that the President has refused to follow the congressionally determined line of succession for one of the Constitution's principal officers.

The Constitution's Appointments Clause requires that the Senate confirm the Attorney General, who is a "principal officer." Supreme Court precedent, early legislation, and historical practice all recognize a single exception: A "subordinate" may serve in temporary and "special circumstances" to maintain the department's unbroken operations. But Mr. Whitaker is no one's subordinate, he was not appointed in response to any such special circumstances, and the President has affirmatively broken the ordinary chain of command. The President planned to remove Mr. Sessions for months, and the Senate-confirmed Deputy Attorney General would otherwise have served by default under the AG Act.

At the very least, the appointment is the subject of great constitutional doubt, which can be avoided by holding that it was not authorized by the Vacancies Act. The Vacancies Act applies to a vacancy "unless" another statute "designates" an acting official, as the AG Act does here. It

therefore authorizes an appointment only when the Senate-confirmed officials specified by the AG Act are unavailable.  Both the statutory text and its purpose refute the Government's arguments that the Vacancies Act and AG Act apply concurrently, and moreover that the President can choose between them.

This Court should accordingly hold that Mr. Whitaker was not validly appointed as the Acting Attorney General.

## BACKGROUND

The Constitution's Appointments Clause provides that "Officers of the United States" may serve only "by and with the Advice and Consent of the Senate."  U.S. Const. art. II, § 2, cl. 2.  This requirement applies to "principal officers."  *Edmond v. United States*, 520 U.S. 651, 660-63 (1997).  The Attorney General, who reports only to the President and is in charge of federal law enforcement, is a paradigmatic principal officer.

In 2017, the Senate confirmed Jeff Sessions as Attorney General.  For months, the President criticized Mr. Sessions for recusing from the Department of Justice's investigation into whether the President and his campaign colluded with Russia and obstructed justice.  *E.g.*, Devlin Barrett, John Wagner & Seung Min Kim, *Trump and Sessions Feud Over the Direction of the Justice Department*, Wash. Post (Aug. 23, 2018), https://wapo.st/2RHxLWC.  It was widely reported that the President would force out Mr. Sessions promptly after the 2018 midterm elections.  *E.g.*, Alexandra Hutzler, *Donald Trump Will Fire Jeff Sessions After Midterms, Republicans Say*, Newsweek (Aug. 24, 2018), http://bit.ly/2rrHQLM.  He did.

The AG Act provides that other Senate-confirmed officials in the Department will serve if the Attorney General is unavailable.  28 U.S.C. § 508.  The Deputy Attorney General may serve; if the Deputy is unavailable, other officials shall do so.  *Id.*  If those officials are all unavailable,

the statute is silent.  An Executive Order issued under the Vacancies Act then specifies other Senate-confirmed officials who will serve as Acting Attorney General.  Exec. Order No. 13,787 (Mar. 31, 2017), http://bit.ly/2BVYNnw.

The Deputy Attorney General is Rod Rosenstein, who is best known for overseeing the Russia investigation.  When the President forced out Mr. Sessions, Mr. Rosenstein was available to serve as Acting Attorney General, and would have done so as a matter of law had the President done nothing more.  But the President has been harshly critical of Mr. Rosenstein's own failure to limit the Russia investigation. *See* Ashley Parker & Amy B. Wang, *Trump Criticizes Democrats, 'Russian witch hunt,' and Coastal Elites at Ohio Rally*, Wash. Post (Aug 4, 2018), https://wapo.st/2G7kzJ8; Pamela Brown *et al.*, *Trump Considering Firing Rosenstein to Check Mueller*, CNN Politics (Apr. 10, 2018), https://cnn.it/2C4RhGZ. He purported to appoint Matthew Whitaker instead, under the Vacancies Act.

Mr. Whitaker was then serving as the Attorney General's Chief of Staff, a non-confirmed position.  Previously, he was best known for his public protestation that the Russia investigation should be narrowed or terminated. Matthew Whitaker, *Mueller's Investigation of Trump is Going Too Far*, CNN Opinion (Originally Published Aug. 6. 2017), https://cnn.it/2QEa9ol. Once he took office as Acting Attorney General, Mr. Whitaker appointed his own Chief of Staff from outside the Department of Justice.

## ARGUMENT

The Government asserts that the President validly appointed Mr. Whitaker.  It bases that assertion on the argument that the President may remove any critical principal officer—such as the Attorney General, the Secretary of Defense, the Chairman of the Joint Chiefs of Staff, and the Director of National Intelligence—whenever he likes and replace all of them with unqualified,

non-confirmed employees rather than the Senate-confirmed officials designated by Congress.[1]  In fact, the President's appointment of Mr. Whitaker violated the Constitution's Appointments Clause.  At the very least, the appointment raises significant constitutional doubt that can be avoided by holding that the appointment was not authorized by the Vacancies Act.

I.      **The President's Appointment of Matthew Whitaker Violated the Appointments Clause.**

        A.      **The Appointments Clause Requires That the Senate Confirm an Officer Who Exercises the Authority of a Principal Officer And (1) Is Not a Subordinate or (2) Was Not Appointed In Response to "Temporary and Special Conditions."**

The requirement of the Appointments Clause that the Senate confirm a principal officer is essential to the separation of powers.  *Freytag v. Comm'r*, 501 U.S. 868, 882 (1991).  In particular, "Advice and Consent . . . . serves both to curb Executive abuses of the appointment power and 'to promote a judicious choice of [persons] for filling the offices of the union.'" *Edmond v. United States*, 520 U.S. 651, 659-60 (1997) (quoting *The Federalist No. 76*, at 386-87, internal citations omitted).  Particularly prescient to these events, "[t]he 'manipulation of official appointments' had long been one of the American revolutionary generation's greatest grievances against executive power, because the power of appointment to offices was deemed the most insidious and powerful weapon of eighteenth century despotism." *Freytag*, 501 U.S. at 883 (quoting G. Wood, *The Creation of the American Republic 1776-1787*, at 79 (1969)).

The Supreme Court addressed the circumstances in which a government official is a "principal officer" in *Edmond*.  There, the Court held that members of the Coast Guard Court of

---

[1] *See, e.g.*, 10 U.S.C. § 132(b) (automatic succession by Deputy Secretary of Defense); 10 U.S.C. § 154(d) (Vice Chairman of Joint Chiefs of Staff); 50 U.S.C. § 3026(a) (Principal Deputy Director of National Intelligence).

Criminal Appeals were "inferior," not "principal" officers.  It reasoned: "Whether one is an 'inferior' officer depends on whether he has a superior," *id.* at 662, explaining:

> [I]n the context of a Clause designed to preserve political accountability relative to important Government assignments, we think it evident that "inferior officers" are officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate.

*Id.* at 663. The Court explained that its holding was supported by "the views of the first Congress," which created the second-in-command position of "Chief Clerk" to the Secretaries of State and War. The Chief Clerk exercised significant authority within those departments but was designated as an "inferior officer" who reported directly to, and was removable by, the Secretary. *Id.* at 663-64.

The Court in *Edmond* identified *United States v. Eaton*, 169 U.S. 331 (1898), as a case in which an official was not a "principal officer" requiring confirmation. *Eaton* upheld the position of "vice consul"— a designated State Department employee stationed in an overseas mission.  *Id.* at 337.  Congress defined the vice consul's responsibilities as temporarily performing the responsibilities of the consul-general while the latter was sick or absent, or until a replacement arrived if the consul-general died.  The vice consul had two principal officers as superiors.  His actions were subject to reversal when the Senate-confirmed consul-general returned to service, or by the replacement official if the consul-general died.  The vice consul also reported to, and was subject to replacement by, the Secretary of State.  *Id.* at 339.

The vice consul was not a Senate-confirmed officer.  The Supreme Court in *Eaton* therefore considered two questions.  First, the issue addressed in *Edmond*: Was the "vice consul" a "principal officer" rather than a mere subordinate?  Second, in any event, does the Constitution categorically require confirmation whenever even a subordinate exercises the powers of the principal?  The Court held that the answer to both questions was "no," such that the vice consul need not be

confirmed.  It reasoned that (1) the vice consul was a "subordinate" position; and (2) confirmation was not required because the vice consul exercised the powers of the principal officer only for a "limited time" in response to "temporary and special conditions."  169 U.S. at 343-44; *see also id.* at 343 (a "principal officer" "does not embrace a subordinate *and* temporary officer like that of vice-consul *as defined* in the statute" (emphases added)).

First, the Court held that the vice consul was "a mere subordinate official."  169 U.S. at 344.  The Court looked to the job requirements: "The manifest purpose of Congress in classifying and defining the grades of consular offices, in the statute to which we have referred, was to so limit the period of duty to be performed by the vice-consuls and thereby to deprive them of the character of consuls in the broader and more permanent sense of the word."  *Id.* at 343.  The vice-consul's principal responsibility was to serve only during the consul-general's absence, and the consul-general could of course reverse any decision of the vice-consul on his return, as could the Secretary of State at any time. Vice consuls were accordingly "subordinate officers who were to represent the principals in case of absence."  *Id.* at 336; *see also id.* ("subordinate and temporary officer" who would "exercise such authority" of the principal "when the lawful occasion for the performance of the duty arose").

The vice consul was thus merely a previously designated person who could be "called upon to discharge the duties" of the consul-general in an exigency.  169 U.S. at 340. Indeed, the State Department rejected Eaton's use of the title "acting consul-general," specifying that he was instead the "vice-consul-general" temporarily exercising the authority of the consul-general.  *Id.* at 333.

Second, the Supreme Court separately addressed whether even a subordinate becomes *ipso facto* a principal officer merely by exercising the principal's authority.  *See* 169 U.S. at 333 (addressing "[t]he claim that Congress was without power to vest in the President the appointment

of a subordinate officer, to be charged with the duty of temporarily performing the functions of

the consular office").  The Court held that performance of the principal's responsibilities did not

always require confirmation. It reasoned that a subordinate must be able to perform the functions

of a principal officer in limited circumstances, because otherwise it would be impossible for the

government to perform its statutorily assigned responsibilities:

> Because the subordinate officer is charged with the performance of the duty of the
> superior for a limited time and under special and temporary conditions, he is not
> thereby transformed into the superior and permanent official. To so hold would
> render void any and every delegation of power to an inferior to perform under any
> circumstances or exigency the duties of a superior officer, and the discharge of
> administrative duties would be seriously hindered.

*Id.*

The temporary and special conditions that limited when the vice consul would perform the

consul-general's duties were plain from the governing statute.  "The manifest object of the

provision was to prevent the continued performance of consular duties from being interrupted by

any temporary cause, such as absence, sickness or even during an interregnum caused by death

and before an incumbent could be appointed."  169 U.S. at 339; *see also id.* (Congress secured "an

unbroken performance of consular duties by creating the necessary machinery to have within reach

one qualified to perform them, free from any vicissitude which might befall" the consul-general.).

The position was necessary "to guard against [the] contingency" that the "public interest must

inevitably suffer in consequence of the closing of the consular office."  *Id.* at 342.  "This was

secured by the designation in advance of a subordinate and temporary official who, in the event of

happening of the foregoing conditions, would be present to discharge the duties."  *Id.* at 339.

## B.   The President's Appointment of Matthew Whitaker Violated the Appointments Clause.

The Government's argument that Mr. Whitaker's appointment is constitutional requires

this Court to collapse the holding of *Eaton* (and *Edmond* as well) into a single question: Is the

appointment "temporary"?  By that, the Government means: Will the officer be replaced some day?  But that of course makes the Appointments Clause effectively a dead letter, because it permits the President to make *any* appointment without Senate confirmation in any circumstances, including when the President creates the vacancy.  The President need only intone that the appointment is "temporary," in the sense that the official will eventually be replaced—even many months later.  Indeed, that official could be replaced by *another* "temporary" official.  That is not hyperbole.  The Opinion of the Office of Legal Counsel approving Mr. Whitaker's appointment asserts that the *only* requirement of the Appointments Clause is that the President formally designate the official's service as "temporary."  *See* Memorandum for Emmet T. Flood, Counsel to the President, from Steven A. Engel, Assistant Attorney General, Office of Legal Counsel, *Re: Designating an Acting Attorney General* at 15 (Nov. 14, 2018) (*2018 OLC Opinion*), *attached to* [fill in].

The officials that can serve as Acting Attorney General under the Supreme Court's decisions in *Edmond* and *Eaton* are those specified by Congress under the AG Act: the Deputy Attorney General; and if the Deputy cannot serve, the Associate Attorney General and other designated officials.  Even if those officers were not confirmed by the Senate, they would be "subordinates" because Congress designed their job so that they report to the Attorney General.  Further, the offices of those officials are classified and defined to perform the duties of the Attorney General only in response to temporary and special conditions—generally the Attorney General's sickness or absence.  In every circumstance, their service is necessary for the "unbroken" performance of the Attorney General's responsibilities.  Indeed, the Senate confirmed them in the knowledge that they would be called upon if the Attorney General was unavailable.

The officials designated by the AG Act are thus the equivalent of the vice-consul in *Eaton*. But according to the Government, the Supreme Court in that case would equally have upheld an order of the President firing a consul-general and replacing him indefinitely with an *ad hoc*, hand-picked official—for example, the President's personal acquaintance, the consul-general's personal secretary. That is not a reasonable reading of the decision, because it renders all of the Supreme Court's reasoning meaningless.

For the reasons that follow, the Government's argument that the Appointments Clause equally permits the President to appoint Mr. Whitaker lack merit.

### 1.      Mr. Whitaker Is Serving as a Principal Officer, Not a Subordinate.

Under the Appointments Clause, a principal officer is one who has no "superior"—the officer's work is not "directed and supervised at some level by" a principal officer. *Edmond*, 520 U.S. at 651. The inquiry is: How did Congress "classif[y] and define[]" the position? *Eaton*, 169 U.S. at 343. In *Edmond*, the civilian judges of the military court of criminal appeals were not principal officers because their work was overseen by the Judge Advocate General and, in turn, the Secretary of Transportation. *Id.* at 664. In *Eaton*, the vice consul was overseen by the consul-general and (even if the consul-general had died) the Secretary of State. 169 U.S. at 339. Indeed, the Secretary of State took care to ensure that such an official held himself out as the "vice consul-general," not the "acting consul-general." *Id.* at 333.

No part of Matthew Whitaker's position as Acting Attorney General was "classif[ied] and defin[ed]," *Eaton*, 169 U.S. at 343, to ever involve any oversight by any principal officer. He reports directly to the President, and only to the President. There never will be a day in which any principal officer can tell him what to do, or remove him if he refuses.

There is in fact no substantive difference between what Mr. Whitaker does every day in his position and what a permanent Senate-confirmed Attorney General will do. Mr. Whitaker

exercises all of the powers of the Attorney General and bears all of that office's responsibilities. He is never exercising those powers on behalf of some other Senate-confirmed official, in anticipation of that official's return. He is no longer serving as Chief of Staff, but rather has named a replacement.

The fact that Mr. Whitaker will *never* be supervised is a critical distinction. If Mr. Whitaker is not a "principal officer," then *no* non-confirmed person exercising all the powers of a principal officer ever is, if they serve for less than the maximum period under the Vacancies Act. To be sure, even those officials who serve as Acting Attorney General under the AG Act may not be supervised by a principal official during a vacancy. But their *jobs* are defined so as to always remain subject to that supervision. The Senate also confirmed those officers in an expectation that they might perform the Attorney General's functions. Further, they continue to hold their other, subordinate positions. For example, the Deputy Attorney General remains in that position while serving as Acting Attorney General; no other official takes on the Deputy's role.

> **2.     Even If Mr. Whitaker Is an "Inferior Officer," His Performance of the Attorney General's Responsibilities Was Not Necessitated by "Temporary and Special Conditions."**

The Government argues that it is sufficient under the Appointments Clause that Mr. Whitaker merely serve "temporarily." But even putting to the side that he is not a subordinate, *see* Part I-A-1, *supra*, the Supreme Court in *Eaton* held that it was *not* sufficient that the appointee's service be "for a limited time." 169 U.S. at 343. It concluded that the Appointments Clause requires the confirmation of an otherwise subordinate officer whose job responsibilities were not limited to "the performance of the duty of the superior for a limited time *and under special and temporary conditions*. *Id.* (emphasis added). In *Eaton* itself, the vice consul served during the consul-general's absence, sickness or death. The Supreme Court recognized that Congress found

it was necessary to designate a vice consul in advance to provide for the "unbroken" operations of the consul.  *Id.*

The Government's argument that the appointee's service need only be "temporary" also bears no relationship to the Supreme Court's reasoning in *Eaton*.  There, the Court refused to read the Constitution in a way that would make it impossible to ever delegate the responsibilities of a principal officer.  Approving every nominally "temporary" appointment goes vastly further and makes the Appointments Clause essentially meaningless.

The Government notably does not even argue that Mr. Whitaker's position is a response to any special condition.  He never was designated to serve—by either Congress or the President— when the Attorney General was sick or absent.  Rather, the President affirmatively forced out the Attorney General.  He did so after significant planning.  Further, given the availability of the officials designated by Congress in the AG Act, it was not necessary to appoint anyone else to ensure the Department's unbroken operations.  To the contrary, the President "broke" the predetermined line of succession.

Indeed, the President claims the authority to name as Acting Attorney General any GS-15 or above in the Department of Justice (more than 6,000 lawyers) or any Senate-confirmed official from *any* department (of which there are more than 1,200).  Mr. Whitaker was the Attorney General's chief of staff.  Traditionally, that position involves no substantive portfolio or direct line of authority over the Department's more than 110,000 employees.[2]

---

[2] It is also relevant—but not decisive—that the vice consul in *Eaton* and the Senate-confirmed officials identified by the AG Act are designated in advance.  Mr. Whitaker was not. That characteristic makes it much less likely that the President can evade the Appointments Clause by appointing an *ad hoc* official to serve his own particular needs in the moment, rather than the interests of the Department as a whole.

**C.      The Original Vacancies Act and Appointments Close to the Time of the Founding Confirm That the Appointment of Mr. Whitaker Is Unconstitutional.**

The appointment in this case is, literally, unprecedented.  This is the first time in American history that the President has refused to follow the congressionally determined line of succession for one of the Constitution's "principal officers."[3]

The meaning of the Appointments Clause is informed by the historical practice of Congress and the Executive Branch in the years immediately following the founding.  *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2560-62 (2014).  The Government itself recognizes that Congress's adoption of the first Vacancies Act—enacted in 1792—best shows the founders' understanding of the Appointments Clause.  *See generally 2018 OLC Opinion* at 11.  But that law permitted the President to name acting officials in three departments only temporarily, and only when the officeholder died, or was sick or absent.  Act of May 8, 1792, ch. 37, § 8, 1 Stat. 279, 281.

An appointment under that law had none of the features of this one: (1) It did not allow the President to make an appointment if he removed a department head; (2) the appointment could only be in response to special conditions; and (3) the appointment was necessary to provide for the department's unbroken operations, because there were no other officials in a statutorily prescribed

---

[3] The only previous appointments that were arguably analogous did not occur until 2003 and 2007.  Neither involved the President disregarding a congressionally specified acting official. In 2003, the President appointed an acting official of the Office of Management and Budget under the Vacancies Act, when Congress had also separately granted the President power to name acting officials in that agency.  *Designation of Acting Director of the Office of Management and Budget*, 27 Op. O.L.C. 121 (2003).  In 2007, the President named a Senate-confirmed officer in the Department of Justice as Acting Attorney General, when all the officials designated by the AG Act were unavailable.  The appointment only overrode the Attorney General's own designation of who should serve next.  *Authority of the President to Name an Acting Attorney General*, 31 Op. O.L.C. 208 (2007).

line of succession.  Indeed, it is striking that Congress did not even believe it was necessary to authorize an acting appointment at all for the Attorney General.[4]

The history of acting service near the time of the founding similarly confirms that the appointment of Mr. Whitaker is unconstitutional.  In the most-relevant period, between 1789 and the War of 1812, non-confirmed officials who served on an acting basis were the pre-determined subordinates, who performed the functions of principal officers only in temporary and special circumstances.  Almost always, the department's second-in-command stepped in temporarily while the Secretary was briefly sick or away.  *See* Exhibit A, *infra*.  Those periods precisely track the service of vice-consuls in *Eaton*.

In that time, there were also 21 vacancies in the cabinet and the Office of Postmaster General.  *See id.*  Overwhelmingly, the President either left the position vacant (twelve times) or appointed another Senate-confirmed official (eight times).

The President temporarily filled the vacancy with a non-confirmed official only one time, at most.  The acting official in that singular case was still a subordinate: the department's second-in-command.  Further, the appointment was both in response to a special condition and necessary to ensure the department's unbroken operations.  With only two weeks left in the Jefferson

---

[4] Congress did later extend the Vacancies Act to cover a "vacancy" and to impose a six-month limit on the length of a non-confirmed appointee's service.  But that time limit did not merely mirror the requirements of the Appointments Clause.  If it did, the statute would have been unnecessary and would not have applied to just three departments.  Rather, Congress prohibited an acting appointment from *ever* lasting longer than six months, even when the Appointments Clause would permit it due to an extended exigency.  The vice consul in *Eaton*, for example, served for ten months because he was stationed far abroad in Siam, in an era when travel was much more arduous and time-consuming.  169 U.S. at 333-34.  Certainly, statutory time limits do not help the Government, as Mr. Whitaker's appointment already exceeds the ten- and thirty-day limits imposed by the next two Vacancies Acts; a 120-day period was not adopted until 1988.  *See* Act of July 23, 1868, ch. 227, § 3, 15 Stat. 168, 168; Pub. L. No. 89-554, 80 Stat. 378, 426 (1966); Pub. L. No. 100-398, 102 Stat. 985, 988 (1988).

Administration, the Secretary of War (Henry Dearborn) resigned.  *See* Exhibit B at 1, *infra*.  The President appointed the department's second-in-command (Chief Clerk John Smith).  *Id.* at 2-3; *see also Edmond*, 520 U.S. at 663-64 (discussing Chief Clerks as subordinate officers at the founding).  It would have made no sense for Jefferson to nominate someone who could not be confirmed before Madison took office.  It was also difficult for any other confirmed Secretary to step in while the cabinet turned over.  (In fact, the official biographies of both Congress and the Army state that Dearborn actually continued to serve until the Senate confirmed his permanent successor, suggesting that Smith did not even serve in this period.  Exhibit B at 4, 9-10, *infra*.

According to the Government, Mr. Whitaker's appointment is nonetheless supported by later periods of acting service.  Those examples would not be evidence of the Appointments Clause's original meaning.  The Government offers no explanation of why the President's designation of an Acting Secretary of State in 1850 is a relevant source of information, particularly given that there were periods of acting service near the founding itself.

But the Government's examples don't support its position anyway.  Even stretching all the way to 1860, outside of appointments authorized by the Recess Appointments Clause, the President temporarily appointed non-confirmed officials a total of 23 times.  Exhibit C, *infra*, at 9-11.  The appointee was a subordinate—the department's pre-determined second-in-command— with only a single exception, who served for a total of two days.  Each appointment also responded to special conditions:  the President's term ended (14 times); the principal officer resigned or died in office (8 times); or the Senate rejected a permanent nominee (once, for the first time in U.S.

history).  The President maintained the department's unbroken operations (with only the one, passing exception) by appointing department's the most senior remaining official.[5]

The history of the vacancies specifically in the Office of Attorney General is even worse for the Government.  Between 1789 and 1860, presidents repeatedly left the Office vacant—once for seven months—rather than attempting to install a non-confirmed official, just as presidents had in the founding quarter century.  In American history, there was only one time that the President ever named a non-confirmed official as Acting Attorney General.  That was in 1866.  Again, the appointee was a pre-determined subordinate, there were special conditions, and the President maintained the Department's unbroken operations by appointing its second-in-command, rather than naming an *ad hoc* official.  Andrew Johnson's Attorney General (James Speed) had resigned in protest of the President's policies.  But the country badly needed someone to serve during the ongoing fight over the first civil rights law protecting African Americans.  Johnson appointed the second-in-command (Assistant Attorney General J. Hubley Ashton) for six days, apparently while the permanent successor traveled to Washington, D.C.

But even those few, limited examples were too much for Congress.  In 1868, it enacted a new Vacancies Act.  Act of July 23, 1868, ch. 227, 15 Stat. 168.  That statute only allowed the President to name Senate-confirmed officials as acting appointees.  And it strictly limited their service to ten days.  *Id.*

---

[5] The temporary appointment also almost always lasted less than one week.  Mr. Whitaker's service is already longer than every example but one.  The sole exception arose from special conditions.  President Tyler's cabinet resigned to protest his anti-Whig policies.  The Senate (controlled by Whigs) strongly resisted the President's nominees, rejecting 7 out of 20 during his presidency.  In one instance, it took 43 days to find and confirm an acceptable permanent secretary.  Mr. Whitaker's appointment does not implicate that special condition; this Senate is substantially more accommodating of this President.

## II.      The President's Appointment of Mr. Whitaker Was Not Authorized by the Vacancies Act.

At the very least, given the foregoing, there is significant doubt that the President's appointment of Mr. Whitaker is constitutional.  *See NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 946 (2017) (Thomas, J., concurring) ("Appointing principal officers under the [Vacancies Act], however, raises grave constitutional concerns because the Appointments Clause forbids the President to appoint principal officers without the advice and consent of the Senate.").  The Court can avoid that doubt by holding that the appointment was never authorized by statute.

The Government's position requires reading the Vacancies Act itself to violate the Appointments Clause.  The statute would allow the President to name an acting principal officer at any time, without the position being classified or defined to report to a principal officer and in the absence of any special conditions, all of which are required by the Supreme Court's decision in *Eaton*.  The Whitaker appointment is of course a perfect example.  It is a "cardinal principle" of statutory construction that, because it is "fairly possible" to read the Vacancies Act in a way that avoids that constitutional question, the court must reject the Government's interpretation of that statute.  *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001).  For the reasons that follow, the Government's reading is plainly wrong in any event.

### A.      The Vacancies Act Permits the President to Appoint the Acting Attorney General Only When the AG Act Does Not "Designate" a Senate-Confirmed Official.

Properly understood, the AG Act and the Vacancies Act work together in a way that is fully consistent with both of their texts and the Appointments Clause.  The President may appoint a non-confirmed acting official in the special condition that the Senate-confirmed officers designated by the AG Act are unavailable.

When the Attorney General is unable to serve, the AG Act designates an order of succession by Senate-confirmed officials: the Deputy may serve; if he does not, then the Associate shall; if they are unavailable, other Senate-confirmed officials serve in the order specified by the Attorney General; if none of those officials are available, the statute is silent.  28 U.S.C. § 508. Having been confirmed, Mr. Rosenstein and the other Senate-confirmed officials are of course proper acting officials under the Appointments Clause.  When Mr. Sessions "resigned," Deputy Attorney General Rod Rosenstein was available and would be the Acting Attorney General under the AG Act.

The Vacancies Act did not grant the President the power to appoint a different official. That is true for two independent reasons.  First, the Vacancies Act is explicitly inapplicable if another statute "designates" an acting official.  The Vacancies Act provides that it is "the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any [Senate-confirmed] office of an Executive agency . . ., *unless* – (1) a statutory provision expressly . . . (B) *designates* an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity."  5 U.S.C. § 3347(a) (emphases added).  To "designate" is to "choose (someone or something) for a particular job or purpose."  *Black's Law Dictionary* 541 (10th ed. 2014).  The Government concedes that the AG Act, which triggers the "unless" clause, "designates"—*i.e.*, chooses—the officer who performs the functions of the Attorney General in an acting capacity—here, Mr. Rosenstein.  The Vacancies Act is therefore inapplicable and did not authorize the President to displace Mr. Rosenstein and appoint Mr. Whitaker in his place.

Second, and independently, even if the Vacancies Act "applies" concurrently when the AG Act designates a successor, the latter statute controls.  In that situation, *both* statutes apply.  If one took the Government's argument seriously, there are now *two* Acting Attorneys General: Matthew

17

Whitaker (under the Vacancies Act) and Rod Rosenstein (under the AG Act).  No provision makes the AG Act "inapplicable"; the Government concedes as it must that the Vacancies Act's "exclusivity" clause does not apply.  Nor does any provision give the President the power to "choose" between the statutes or to override the AG Act.  By contrast, for some offices, Congress did in fact give the President the power to override Congress's designation of the default successor. *E.g.*, 38 U.S.C. § 304 (Secretary of Veterans Affairs); 40 U.S.C. § 302(b) (Administrator of General Services); 42 U.S.C. § 902(b)(4) (Commissioner of Social Security).[6]

Indeed, the Supreme Court specifically has made clear that when Congress intended in the Vacancies Act to override a default appointment of an acting official, it did so expressly.  The Court explained that, when Congress sought to permit the President to override the default appointee under section 3345(a)(1), it granted that authority "notwithstanding paragraph (1)."  *See SW Gen.*, 137 S. Ct. at 936.  But on the Government's reasoning, the Supreme Court's reasoning is wrong and that proviso is meaningless, because the President would have the power to "choose" between the two provisions automatically.

---

[6] This case of course illustrates how the two statutes produce conflicting results.  The AG Act is self-operative; it does not give the President any choice.  It designates Mr. Rosenstein as a matter of law.  By contrast, under the Vacancies Act, the President had a choice and chose Mr. Whitaker.

The inconsistency is also illustrated by the scenario in which the Attorney General resigns and the President does nothing.  If both statutes apply, the Deputy Attorney General is simultaneously not subject to time limits (under the self-operative provisions of the AG Act) and subject to a 210-day limit (as "first assistant" who is the default successor under the Vacancies Act).  *Compare* 28 U.S.C. § 508(a), *with* 5 U.S.C. § 3345(a)(1).  There is also a conflict if the Deputy is unavailable and the President does not act: the Associate Attorney General "shall" serve (under the AG Act); while simultaneously *no* officer may lawfully hold the position (under the Vacancies Act).  *Compare* 28 U.S.C. § 508(b), *with* 5 U.S.C. §§ 3345(a), 3348(b) (office must remain vacant).

Here, there is no such "notwithstanding" language, so both statutes apply.  As the Supreme Court again explained with respect to the Vacancies Act, "[i]t is a commonplace of statutory construction that the specific governs the general."  *SW Gen.*, 137 S. Ct. at 941 (quoting *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012)) (alterations omitted).  That is unquestionably the AG Act.

On the Government's contrary method of interpretation, numerous cases dealing with inconsistencies between general and specific statutes are all wrongly decided.  So long as the statutes were "non-exclusive," the President need only to have "chosen" which one to apply.

By contrast, there is a special circumstance in which the President could appoint the Acting Attorney General under the Vacancies Act consistent with both the statute and the Appointments Clause: when none of the Senate-confirmed officials specified by the AG Act are available.  That will happen most often during the transition between presidential administrations, when political appointees resign or are removed.  The Vacancies Act itself recognizes that scenario deserves special attention.  5 U.S.C. § 3349a (allowing non-confirmed officers to serve for a longer period during presidential transitions).

In that circumstance, the AG Act does *not* "designate" the successor; it is silent on who should serve.  5 U.S.C. § 508.  The Vacancies Act is then the "exclusive" means to select the acting official, 5 U.S.C. § 3347(a), empowering the President to select either a Senate-confirmed official or an established, career employee, *id.* § 3345(a)(2)-(3).  Indeed, the President's Executive Order governing succession in the Office of the Attorney General reconciles the statutes in exactly that way; it identifies the acting officials who will serve when those identified by the AG Act cannot.  Exec. Order No. 13,787 (Mar. 31, 2017), http://bit.ly/2BVYNnw.

**B.     The Court Should Reject the Government's Interpretation of the Vacancies Act.**

The Government argues that the Vacancies Act is "applicable to the office of Attorney General," but its provisions are "not the 'exclusive means'" for appointing the Attorney General and other principal officers. *2018 OLC Opinion* at 5, 7. The Government assumes that would mean the President has a choice: follow the procedures of the Vacancies Act; or allow the AG Act to designate the official automatically. *But see* Part II.A., *supra* (explaining that the AG Act is controlling even if the statutes are non-exclusive because it is more specific). In fact, the Government's interpretation cannot be reconciled with the statutory text or Congress's purpose in enacting it.

**1.     Under the plain statutory text, the Vacancies Act does not apply concurrently with an office-specific designation statute.**

The Government ignores that a provision of the Vacancies Act specifies that the statute is never "non-exclusive." Whenever the Vacancies Act "applies" to a vacancy, it is the *only* mechanism to appoint an acting official. Under Section 3348(d), for any "vacant office to which [the Vacancies Act] appl[ies]," "[a]n action taken by any person who is not acting under sections 3345, 3346, or 3347 . . . shall have no force and effect" and subsequently "may not be ratified." 5 U.S.C. § 3348(d); *id.* (the sole exception, which is not applicable here, is if an office-head performs the responsibilities of a subordinate). This provision authorizes only acts by someone "serving as an acting officer under the [Vacancies Act]." *SW Gen.*, 137 S. Ct. at 939; *see also id.* (under the President's authority to appoint officials under Section 3345(b)(1), the phrase "persons serving under this section" are those "acting officers serving at the President's behest"). Hence, the Government cannot be right that there are circumstances in which the Vacancies Act is "non-exclusive" and permits the President to choose between its provisions and office-specific

succession statute such as the AG Act; Section 3348(d) would void any act pursuant to the latter as a matter of law.[7]

Thus, contrary to the Government's submission, Section 3347(a) does not render the Vacancies Act "applicable but non-exclusive" when another statute specifies a successor for a particular office.  Under Section 3348(d), if the Vacancies Act applies to a vacancy, it is *never* non-exclusive.  Only the provisions of the Vacancies Act apply.

The Government also misreads Section 3347(a), which does not override Section 3348(d).  As discussed, that provision makes the Vacancies Act exclusive "unless" something else occurs— *viz.*, another statute "designates" the acting official.  Effectively, Section 3347(a) provides: "The Vacancies Act is the exclusive means to authorize an acting official, unless another statute expressly selects that official."  Read naturally, that language recognizes that the mandatory, office-specific provision chooses the acting official.  It does not grant the President a choice to use the Vacancies Act to override the more-specific "designation."

Another exception to Section 3347(a) demonstrates that the Government's reading is incorrect.  The Vacancies Act is also not "exclusive" with respect to "the General Accountability Office" (GAO).  5 U.S.C. § 3347.  That exception obviously seeks to exclude the GAO, which has its own provision requiring bipartisan appointments.  *See* 31 U.S.C. § 703.  The Vacancies Act consistently excludes it.  *See* 5 U.S.C. §§ 3345, 3347(a), 3347(b), 3348(b), 3348(e), 3349(a).  But

---

[7] A person "who is *not acting under* section 3345, 3346, or 3347," 5 U.S.C. § 3348(d)(1) (emphasis added), is someone who "is acting under" some other statutory authority.  For example, when the Deputy Attorney General serves temporarily as the Acting Attorney General under the AG Act, he is "not acting under sections 3345, 3346, or 3347."  If Congress intended to approve acts under statutes that are exempt from the Vacancies Act, it would have used the same formulation as Section 3348(b) and referred to "an officer or employee [who] is performing the functions and duties *in accordance with* sections 3345, 3346, and 3347" (emphasis added).

under the Government's reading, the Vacancies Act *does* apply to the GAO; the statute is merely "non-exclusive" and gives the President the choice whether to follow it.

        **2.**     **Congress enacted the Vacancies Act precisely to reject the argument that it is "non-exclusive," while preserving the AG Act and other office-specific designation statutes.**

The Government's reading also cannot be reconciled with the well-documented history and purpose of the Vacancies Act, including Section 3347(a)'s "exclusivity" clause. Congress adopted the statute precisely to *prevent* the President from treating the statute as "non-exclusive" when it applied. The Government's reading turns the Vacancies Act on its head and creates the problem Congress was trying to solve.

The predecessor vacancies statute was silent on whether, when it applied, other provisions could also be used to name an acting official. 5 U.S.C. §§ 3346-49 (1966). The Office of Legal Counsel made much of the fact that the statute lacked a provision that made it the "exclusive" means of appointing officials. *See The Vacancies Act*, 22 Op. O.L.C. 44, 44 (Mar. 18, 1998) ("The Vacancies Act is not the exclusive authority for temporarily assigning the duties of a Senate confirmed office. Statutes vesting an agency's powers in the agency head and allowing delegation to subordinate officials also may be used to assign, on an interim basis, the duties of certain vacant Senate-confirmed offices."). On that basis, it asserted that acting officials also could be named (first in the Department of Justice, and later in other departments) under the Attorney General's general authority to delegate powers to non-confirmed officials. Among other things, use of those delegation statutes ostensibly allowed those officials to serve indefinitely, avoiding the strict time limits of the existing vacancies statute. *Id.*

Under the Office of Legal Counsel's position, administrations filled almost 20 percent of Senate-confirmed positions with non-confirmed officials. *See SW Gen.*, 137 S. Ct. at 936. That created an enormous controversy that came to a head in 1997 when President Clinton delegated

the authority of the Assistant Attorney General for Civil Rights to Bill Lann Lee, who the Senate had refused to confirm. *Id.*

Congress enacted the Vacancies Act shortly thereafter for the specific purpose of rejecting the Office of Legal Counsel's position. *See, e.g.*, *Oversight of the Implementation of the Vacancies Act: Hearing on S. 1764 Before the S. Comm. on Governmental Affairs*, 105th Cong. 54 (1998) (*1998 Hearing*) (S. 1764 § 2 [Findings]).   The statute's evolution demonstrates that Congress intended that the statute (1) would be exclusive when it applied, and (2) would not override office-specific designation statutes.

The early drafts of the Vacancies Act loosely provided that it would be "applicable to any office" and moreover lacked a provision forbidding the President from using another statute to fill a vacancy. *See 1998 Hearing* 58 (S. 1764 § 3); S. Rep. No. 105-250, at 26 (1998) (S. 2176, 105th Cong. sec. 2, § 3347 (1998)).   The Department of Justice's testimony on the bills made clear that it would not treat that legislation as sufficient to make the Vacancies Act "the exclusive authority for temporarily assigning the duties and powers of a Senate-confirmed office." *1998 Hearing* 139 (Department's written testimony).

In response, Congress changed the statutory language in three ways.   First, it added Section 3347(b), which states that "[a]ny statutory provision providing general authority . . . to delegate duties" does not trigger the statute's exemptions.

Second, Congress added an "enforcement mechanism for the statute."   S. Rep. 105-250, at 17.   That was Section 3348(d), which—for offices subject to the Vacancies Act—forbade the President from choosing between its provisions and another source of statutory authority. *See supra* at 20.

23

Third, Congress substituted the word "exclusive" for "applicable to"—using the *precise* word that the Department of Justice had repeatedly stressed was missing from the prior Vacancies Act.  The principal sponsor of the legislation explained the change, and made clear that it did not alter the rule that office-specific designation statutes would remain an "exception" to the Vacancies Act:

> The phrase "applicable to" is replaced by "the exclusive means for temporarily authorizing an acting official to perform the functions and duties of" in § 3347(a) to ensure that the Vacancies Act provides the sole means by which temporary officers may be appointed unless contrary statutory language as set forth by this legislation *creates an explicit exception*.

144 Cong. Rec. S12813 (Oct. 21, 1998) (Sen. Thompson) (emphasis added); *see also* 144 Cong. Rec. S11022-23 (Sept. 28, 1998) (Sen. Thompson) ("The bill will extend the provisions of the Vacancies Act to cover all advice and consent provisions in executive Agencies *except those* that are covered by express specific statute[s] that provide for acting officers to carry out the functions and duties of the office.") (emphasis added).

Congress's focused purpose to reject the Office of Legal Counsel's position that the Vacancies Act is "non-exclusive" is laid out unambiguously in fine detail in two Congressional Research Service Reports, an extensive congressional hearing that included written and oral testimony from the Department of Justice, a Senate report on the draft bill, and multiple detailed floor statements.[8]  It involved "months of study, months of discussion, and months of difficult negotiation."  144 Cong. Rec. S11025 (Sept. 28, 1998) (Sen. Byrd).  But there is not one word in

---

[8] *See* Morton Rosenberg, Cong. Research Serv., *The New Vacancies Act: Congress Acts to Protect the Senate's Confirmation Prerogative* (1998); Morton Rosenberg, Cong. Research Serv., *Validity of Designation of Bill Lann Lee as Acting Assistant Attorney General for Civil Rights* (Jan. 1998); *1998 Hearing* 25, 122, 129; S. Rep. No. 105-250; 144 Cong. Rec. S12823 (Oct. 21, 1998) (Sen. Thompson); *id.* at S12824 (Sen. Byrd).

any of those voluminous materials stating that Congress intended to grant the President the power that the Government claims here.   Just as important, the Department of Justice never even *requested* that authority.  *See supra* at 23 (describing congressional testimony); *see also* Statement of Administration Policy – Federal Vacancies Act of 1998 (Sept. 24, 1998), https://bit.ly/2rvtI4k.

If Congress intended the Vacancies Act to mean what the Government now claims, someone would have said something somewhere at some point, because its implications are startling.   Here, the President has overridden the congressionally determined line of Senate-confirmed officials who succeed the nation's chief law enforcement officer, asserting that he could select from thousands of lawyers in the Department or more than a thousand other Senate-confirmed officials. But that is just the beginning.  As discussed, the Government's position would grant the President the same power with respect to the indistinguishable office-specific statutes for other critical positions such as the Secretary of Defense, the Chairman of the Joint Chiefs of Staff, and the Director of National Intelligence. According to the Government, Congress intended to permit the President to replace all those officials with any of thousands of senior staff members or any Senate-confirmed officer—any of, for example, the seven members of the Social Security Advisory Board, the two trustees of the Federal Old-Age and Survivors Trust Fund, and the nine Directors of the Corporation for Public Broadcasting.

Congress also would have known that it would be departing from the very-well-settled understanding of *both* the legislative and executive branches regarding the relationship between the general vacancies statute and other statutes that designate successors for specific offices.  As discussed, the Department of Justice had maintained that the prior vacancies laws were "non-exclusive," just as it now argues with respect to the current statute.  And Congress had enacted numerous other statutes designating acting principal officers beginning more than a century ago

as well.  But in all that time, the President apparently *never once* used the general provisions of the "non-exclusive" vacancies statute to override an office-specific designation statute.

Those settled office-specific statutes, moreover, have one plain overriding purpose: to permit the Senate to confirm officers in the line of succession who will be qualified to fill in for the principal officer, rather than allowing the President to make his own hand-picked choice from among thousands of unqualified candidates.  By contrast, for some less-significant offices, Congress gave the President the power to override its designation of a default successor; it did so in plain and simple terms.  *See supra* at 18.  The Government's reading requires believing that Congress intended to eliminate those significant restrictions on the President, in ham-fisted statutory language without any member of Congress or the Administration mentioning it.

Reading the Vacancies Act that way violates numerous settled principles of statutory construction, not just the canon of constitutional avoidance.  It is settled that Congress does not fundamentally alter detailed statutory schemes "in vague terms or ancillary provisions"; it does not put "elephants in mouseholes."  *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001).

Nor does it reject long-settled practices by implication.  *Rehberg v. Paulk*, 566 U.S. 356, 361-62 (2012).  That is particularly so when Congress knows how to achieve the same result more directly.  *See, e.g.*, *Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 169 (2014); *Whitfield v. United States*, 543 U.S. 209, 216 (2005).  The Supreme Court has indeed rejected an interpretation of the Vacancies Act where Congress "could easily have chosen clearer language." *SW Gen.*, 137 S. Ct. at 939.

## C.     The Government's Counter-Arguments Lack Merit.

The Government argues to the contrary that its position is supported by a provision of the Vacancies Act that excludes certain independent, multi-member bodies.  5 U.S.C. § 3347c (excluding, for example, a body "composed of multiple members" that "governs an independent

establishment or Government corporation"). The Government finds it striking that the AG Act is not included. But as the Supreme Court has explained in rejecting a similar argument by the Government under the Vacancies Act, an item will be excluded by implication only if the text provides "a sensible inference that the term left out must have been meant to be excluded." *SW Gen.* 137 S. Ct. at 940. Here, it does not. Nothing suggests that Congress intended that provision to provide an exhaustive list of offices to which the Vacancies Act does not apply. It obviously does not, as other provisions of the statute exclude other offices. *See* 5 U.S.C. § 3349b (excluding statutes addressing "holdover" officers); *id.* § 3349(e) (excluding various specific offices from Vacancies Act's enforcement provisions). The reason Congress excluded those multi-member agencies is that they are not "an Executive agency" subject to the Vacancies Act in the first place. *Id.* § 3347. The legislative history makes clear "that [it] has always been the case" that these entities were exempt, and Congress added the provision merely "to avoid any confusion." S. Rep. 105-250, at 22.

The Government also makes passing arguments about the text of the AG Act. But the dispositive point about that statute is undisputed: it "designates" the Acting Attorney General. *See supra* at 17. It therefore makes no difference that the AG Act says the Deputy Attorney General "may" serve (whereas other officials "shall" do so) and is the "first assistant to the Attorney General." 28 U.S.C. § 508(a). Of note, both those provisions were in the statute before Congress enacted the Vacancies Act in 1998, at a time that the Government concedes the AG Act was exclusive, mandatory, and self-operating. Congress did not fundamentally change the meaning of those provisions—and thus the statute as a whole—by failing to delete them in 1998.

Section 508(a) always reflected the possibility that the Deputy "may" be unavailable, thus triggering the Act's remaining succession rules. The statute essentially answers the question "Who

will be Acting Attorney General?" by providing: "The Deputy Attorney General may serve, and if not the Associate Attorney General shall."  Section 508 does not say anything like the President "may choose" or the statute "may apply."  At most, the word "may" could be stretched to mean that the Deputy has a choice.  Congress could not possibly have adopted that language to provide instead that a different statute could designate the Acting Attorney General, because when the AG Act was adopted, no other statute even arguably could do so.

The Government's reliance on the "first assistant" provision is also misplaced.  That provision never had any substantive effect.  It was enacted together with the prior vacancies act, which expressly did not apply to the Attorney General, so it literally did nothing.  5 U.S.C. § 3347 (1966).  And the Government itself believes that the clause does nothing *even today*, because automatic appointments under the AG Act are not subject to the Vacancies Act, which restricts the appointee's length of service.

The Government next argues that the statutory history supports its position because the predecessor vacancies act and also the first draft Senate bill of the 1998 legislation expressly excluded the Office of the Attorney General, but the final statute does not.  *2018 OLC Opinion* at 5 & n.5.  But the reason is obvious: Congress instead wrote a *broader* exception for *every* statute that "designates" a successor for a specific office.  5 U.S.C. § 3347(a)(1)(B).  As the Supreme Court explained in rejecting a similar argument by the Government: "In short, Congress took a provision that explicitly applied only to [the AG Act] and turned it into one that applies to all [officer-specific succession statutes]."  *SW Gen.*, 137 S. Ct. at 942.  Leaving in a provision directed only at the Attorney General would have created confusion about the status of all the other office-specific designation statutes.

Contrary to the Government's suggestion, *2018 OLC Opinion* at 4, the Senate Report on the first Senate bill did not state that the legislation would be non-exclusive. It said the exact opposite: that "statutes that themselves stipulate who shall serve in a specific office" were "express exceptions" to its provisions.  S. Rep. No. 105-250, at 2; *see also supra* at 24 (Senate sponsor making the same point).  The Government asserts the contrary based solely on part of one sentence, wrenched from its context.  That sentence actually explained what "*would*" occur if Congress were "to *repeal* those [office-specific] statutes in favor of the procedures contained in the Vacancies Act." *Id.* at 17 (emphases added).

Finally, the Government relies on a few decisions of other courts.  Two districts court have recently accepted the Government's argument in dictum, albeit on the basis of very truncated submissions.  *United States v. Peters*, No. 6:17-CR-55-REW-HAI-2, 2018 WL 6313534, at *1 (E.D. Ky. Dec. 3, 2018); *United States v. Valencia*, No. 5:17-CR-882, 2018 WL 6182755 (W.D. Tex. Nov. 27, 2018).  The briefing presented to those courts did not approach the level of detail in this Memorandum and the Government's related submissions.

The two other cases relied on by the Government are distinguishable or unpersuasive.  The Ninth Circuit has stated in brief dictum that the Vacancies Act is "non-exclusive." *Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550, 555-56 (9th Cir. 2016).  But it was undisputed that the President could choose the official in that case (the Acting General Counsel of the National Labor Relations Board).  *Id.*  The Ninth Circuit also rested its decision heavily on the one sentence in the Senate Report cited by the Government.  The court was apparently unaware that the Report makes clear that office-specific designation statutes remained "exceptions" to the bill; nor apparently was it aware of the remainder of the statute's history.  *See supra* at 22-26.

A district court upheld the President's appointment of an Acting Director of the Consumer Financial Protection Board when the Director resigned.  *English v. Trump*, 279 F. Supp. 3d 307, 323-24 (D.D.C. 2018).   But that decision is easily distinguishable as well.   The court itself distinguished the AG Act as a statute that would displace the Vacancies Act.  *Id.*   The court also indicated that only the President had statutory authority to make the appointment because the Deputy Director could serve in an acting capacity only in cases of the Director's "absence or unavailability," not a resignation.  *Id.*  The court finally reasoned that its holding result was more consistent with the President's own constitutional authority to participate in selecting principal officers, because the Deputy Director was chosen by the Director.  *Id.*  That reasoning does not apply to the Deputy Attorney General, who is selected by the President.

## CONCLUSION

The Court should hold that the President's Appointment of Matthew Whitaker violates the Appointments Clause and is not authorized by the Vacancies Act.

Dated: December 11, 2018                    Respectfully submitted,

                                            By:  /s/ Thomas C. Goldstein

                                            Thomas C. Goldstein (Bar No. 458365)
                                            TGoldstein@goldsteinrussell.com
                                            Daniel Woofter
                                            dhwoofter@goldsteinrussell.com
                                            GOLDSTEIN & RUSSELL, P.C.
                                            7475 Wisconsin Avenue
                                            Suite 850
                                            Bethesda, MD 20814
                                            (202) 362-0636

                                            Michael E. Zapin
                                            michaelezapin@gmail.com
                                            20283 State Rd. 7
                                            Suite 400
                                            Boca Raton, FL 33498
                                            (561) 367-1444


                                            *Attorneys for Plaintiff Barry Michaels*