# GOLDSTEIN & RUSSELL, P.C.

7475 Wisconsin Ave.
Suite 850
Bethesda, MD 20814

December 14, 2018

The Honorable Randolph D. Moss
U.S. District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, DC 2000

Dear Judge Moss:

    I write with respect to the Government's insistence in its briefing yesterday afternoon that a court may resolve the merits of Plaintiff's claims under its supervisory authority to manage the proceedings before it.

    Our point is not that the Supreme Court lacks that authority but rather that the Justices—perhaps uniquely—do not regard it as exclusive.  To the contrary, they have a strong preference that such questions be resolved in the lower courts in the first instance, subject to later review.  The Government of course argued just that with respect to Plaintiff's Motion to Substitute.

    But if the Court disagrees, there are other easy paths to issuing a prompt ruling on the merits.  Those include our requests related to the Acting Attorney General's personal assessment of the writ of *quo warranto* and the constitutionality of 18 U.S.C. § 922(g)(1).

    Today, the Government added another:  this Court's authority to manage the proceedings before it.  Mr. Whitaker oversees this suit just as he does the proceedings in the Supreme Court in the Plaintiff's challenge to Section 922(g)(1).  Indeed, Mr. Whitaker's palpable personal interest in the question here—and the consequences of his views on the line attorneys—is no doubt considerably stronger.

    We therefore respectfully request that the Court enter an order under its supervisory authority that Mr. Whitaker may not oversee the Government's litigation of this case in this Court.  We believe that issue is ripe for your decision.  The Government has strenuously—if inadvertently, and to its own regret—endorsed your authority.  And of course the substance of the legal issues is briefed.

    We also address the four historical examples discussed by the Government.  *See* Opp. 35.  Even if these examples otherwise supported the Government, they would not inform the meaning of the Appointments Clause.  Only one was even close in time to the founding.  Further, no court ever approved any of them.  Our argument is not that Mr. Whitaker's was the first-ever unconstitutional appointment; one or more of these may have been.

December 14, 2018
Page 2


But these examples do not support the Government's example, in any event.  We discussed John Smith in our Memorandum.  Here, we address the Government's three other examples:  George Graham in 1816; Asbury Dickens in 1831; and McClintock Young in 1844.  All are strongly supportive of Plaintiff's understanding of the Appointments Clause

**George Graham**

George Graham was a soldier and government servant.  He initially served in the Virginia General Assembly and commanded the Fairfax Light Horse in the War of 1812.  Based on that service, President Monroe appointed him Chief Clerk of the War Department in 1814.  He served until late-1817 under two Presidents (Madison and Monroe) and two Secretaries (Crawford and Calhoun).

In October 1816, near the end of the Madison administration, the President moved Crawford to Secretary of the Treasury.  Madison sought to install a permanent replacement even before Crawford left office.  But the Department was widely regarded as a disaster in the wake of the War of 1812.  Madison offered the post to Alexander Dallas, but Dallas turned it down.  Madison appointed the Department's second in command, Graham.

When President Monroe took office, he tried to fill the position too.  But four different potential nominees all declined.  Finally, John Calhoun—who had served in the House of Representatives until November 1817—accepted.

During that period, Graham served as Acting Secretary of War, as described by the Official History of the U.S. Army, "under special Congressional authority."  In that entire period, no other person was appointed Chief Clerk of the War Department in place of Graham.  Graham's successor was Christopher Vandeventer, who assumed office on December 10, 1817.

From 1816 to 1817, Graham also served as Chief Clerk to the Secretary of State.  Notably, when Monroe arrived in office, the offices of both the Secretary of State and the Secretary of War were vacant.  But rather than appoint someone from outside the departments, the President allowed the career second-in-command to serve.  So, for the only time in history, a civil servant served as the ad interim head of *two* departments simultaneously.  Monroe then appointed Attorney General Richard Rush to serve as Secretary of State (also on an *ad interim* basis).

Graham served in a variety of other roles, playing an instrumental part in the founding of West Point.  In 1818, he served as a special agent to the War Department on a secret mission to east-Texas—traveling by smuggling boat—to determine the status of Napoleonic exiles who were attempting to establish a colony there.  At the time, the United States claimed the territory under the Louisiana purchase, but it was relatively unexplored.

December 14, 2018
Page 3

He nearly died from dysentery on the trip.  Graham subsequently served as President of the Washington Branch of the Bank of the United States (from 1819 to 1823) and Commissioner of the General Land Office of the United States (from 1823-1830, dying in office).  Based on his service, he is buried in Arlington National Cemetery.

**Asbury Dickens**

As described in the aptly-titled *Asbury Dickens (1780-1861), A Career In Government Service* (by Ruth K. Nuermberger), "As a public servant for nearly a half century, Asbury Dickens probably knew more of the great and near great than any other man of his time." 24 N.C. Hist. Rev. 281, 281 (1947).  Dickens served as Chief Clerk in the Treasury Department and then the State Department from 1829 to 1836.  He was retained under two Presidents (Adams and Jackson), by two Treasury Secretaries (Ingham and McLane), and two Secretaries of States (McLane and Forsyth).

Dickens began as the Treasury Department's Second Clerk, serving from 1817 to 1824.  President Adams regarded him as "indispensably necessary to the office."  J.Q. Adams, VIII Memoirs 138 (Apr. 16, 1829 entry).  In that period he never served as Acting Secretary.

Dickens was promoted to Chief Clerk in 1829. He then stepped in to serve as Acting Secretary when the principal officer was sick or away nine times between 1829 and 1833.

In addition, in June 1831, President Jackson purged his cabinet of supporters of the Calhoun Administration, including the Secretary of Treasury—Samuel Ingham.  President Jackson offered the position to Louis McLane.  But McLane was in London, serving as Envoy Extraordinary and Minister Plenipotentiary to the United Kingdom.  Jackson did not appoint someone outside the Department in the interim.  Instead, he selected Dickens to maintain the Departments uninterrupted operations.

When McLane arrived in Washington, the Senate was in recess.  Jackson recess appointed him.  Dickens then continued his uninterrupted service as Chief Clerk.

Later, in Jackson's second term, the President appointed the Secretary of State—Edward Livingston—as Envoy Extraordinare and Minister Plenipotentiary to France. Jackson nominated McLane as Secretary of State, who was promptly confirmed.  McLane took Dickens with him as Chief Clerk.  He served until 1836.  In that time, he stepped in as Acting Secretary eleven more times.

Dickens was subsequently elected as Secretary of the Senate, a position he held for a quarter century.  He is revered as a historic figure in the Senate. See Asbury Dickens, Secretary of the Senate 1836-1861, https://bitly.com/2QTRNA2.

December 14, 2018
Page 4

**McClintock Young**

McClintock Young was a career civil servant, too. He served as Chief Clerk in the Treasury Department from 1835 to 1848 under five Presidents (Jackson, van Buren, Harrison, Tyler, and Polk) and six Treasury Secretaries (Woodbury, Ewing, Forward, Spencer, Bibb, and Walker). Under all those Administrations, Young stepped in to serve as Acting Treasury Secretary while the principal was sick or away nineteen times.

In 1844, John Spencer (the fourth Treasury Secretary under whom Young served) resigned in protest during the Tyler Administration (the fourth President under whom Young served). Tyler's relationship with the Senate was very poor. Tyler took office when President Harrison died of pneumonia after a month in office. Harrison was a Whig; Tyler had been, but was removed from the party in 1841. The Senate was controlled by Whigs. It rejected an extraordinary seven of Tyler's twenty nominations.

The Treasury Secretary was the most fraught of all of these. Tyler had moved Spencer from Secretary of War to Treasury Secretary in 1843. He then twice tried to appoint Spencer to the Supreme Court, as the successor to Justices Smith Thompson and Henry Baldwin. The Senate rejected both nominations. When Spencer subsequently resigned in protest, Tyler had to find a new Treasury Secretary—already his fourth. He nominated Caleb Cushing, who had served in the House of Representatives for eight years. There, Cushing had defended Tyler's veto of legislation regarded as vital by the Whigs, including the tariff bill. The Senate rejected the Cushing nomination. Tyler resubmitted the nomination; the Senate rejected it again. Tyler resubmitted the nomination again; the Senate rejected again.

Tyler finally found someone the Whig Senate would accept: George M. Bibb, who was then serving as Chancellor of the Louisville Chancery Court. The total time from Spencer's departure to Bibb's confirmation was 44 days.

McClintock Young then continued his service as Chief Clerk. He remained in that position for four more years. Five more times, he stepped in while the Secretaries were away or ill.

Respectfully submitted,

Thomas C. Goldstein
tgoldstein@goldsteinrussell.com
(202) 362-0636